IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 7, 2012 Session

**IN RE HOLLY B.C. ET AL.**

**Appeal from the Circuit Court for Bradley County**
**No. V-08-733     J. Michael Sharp, Judge**

**No. E2012-00362-COA-R3-PT-FILED-DECEMBER 27, 2012**

This is a termination of parental rights case focusing on two minor children, Holly B.C. (DOB: December 22, 2005) and Kylie M.C. (DOB: December 6, 2006) (collectively "the Children"). Defendants, Angela C. ("Mother") and Chad C. ("Father"), are the biological parents of the Children. The Children were taken into custody in September 2007, after the defendants left them with a church nursery worker for two weeks and did not return during that period. The Department of Children's Services ("DCS") filed a petition to terminate parental rights on September 25, 2008, and a hearing was held on the petition in September 2009. At the conclusion of the hearing, the trial court took the matter under advisement. The court later decided to hold the petition in abeyance to give the defendants an opportunity to make more progress with respect to their permanency plans.[1] In July 2010, the defendants' visitation with the Children was suspended due to alleged danger to the Children. A final hearing was held in September 2011. At that time, the Children had been in state custody for approximately four years. The trial court terminated the defendants' parental rights. The court found, by clear and convincing evidence, that both parents had failed to substantially comply with the permanency plan, that the conditions leading to removal still persisted, and that termination was in the Children's best interest. Defendants appeal. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Arthur Bass, Cleveland, Tennessee, for the appellants, Angela C. and Chad C.

---

[1]There were separate plans for each child. For the sake of convenience, we will refer to these plans in the singular.

Robert E. Cooper, Jr., Attorney General and Reporter, and Aaron E. Winter, Assistant Attorney General, Office of the Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I.

The Children were removed from their parents' custody when they were twenty-one months and nine months old, respectively. DCS was notified that the Children had been left with a church nursery worker for two weeks; that both were sick and in need of medical attention; and that the parents could not be located. On November 5, 2007, the Children were found to be dependent and neglected. The parents, who had been married only a short time, admitted that they left the Children with the nursery worker while they went on a camping "honeymoon," but asserted that they called every day to check on them. The parents admitted that they had no home of their own, and that each of them was living with a relative.

The Children were placed in a foster home, and DCS developed a permanency plan for Mother and Father which included multiple requirements: that the parents obtain stable jobs and stable housing; that they develop a budget; that they attend relationship counseling; and that they develop their parenting skills by working with service providers. The DCS case manager assigned to the case, Ms. Hickman, testified that she initially felt the parents were simply young and needed help to get on their feet, and that reunification would be accomplished fairly quickly. For this reason, the Children were allowed home on a trial pass in January 2008, with parenting trainers and service providers placed in the home to help them.

Hickman testified that initially the trial home visit went fairly well, even though there was at least one report of domestic violence between the parents which concerned her. Hickman testified that Mother lost her job and DCS had to help the parents pay their rent. There were issues with the Children's hygiene such that one of the Children had to be treated for severe diaper rash and both repeatedly had lice. Despite these issues, the trial home visit was ultimately extended, but was terminated in March 2008, when the police were called because Mother left the Children in a car for an extended period of time while visiting her boyfriend's house. The boyfriend's mother reported that Mother had left the Children in a

car for several hours one night when it was below freezing outside.[2] The Children were returned to foster care, and a new permanency plan was developed with the added requirement that the parents identify an appropriate child care provider.

Hickman and the original foster mother advised that the Children both had lice when they came back into custody. Hickman reported that Mother and Father continued to have problems with their relationship, their employment, and their housing. Father was admitted to the hospital in April 2008, for accidently ingesting gun cleaner. Hickman testified that Mother reported she and Father continued to argue frequently, and that Father had hit her and busted her lip. Hickman referred the parents to GRAAB[3] coalition for counseling. Mother called the police a second time in June 2008, and the parties admitted that they were arguing and that Father shoved or pushed Mother. Father went to jail, and was ordered to attend anger management counseling. Father also got into a physical altercation with Mother's boyfriend, Cole G., after Mr. G. drove by the parents' house with his mother, and Father punched Mr. G. in the face. The parents testified that this altercation was initiated by Mr. G. yelling at Father. Mr. G. and his mother disputed this testimony, stating that they were merely driving by and Father ran and jumped on the side of the truck and reached into the window to punch Mr. G.

DCS alleged as grounds for termination: (1) substantial noncompliance with the permanency plan; (2) that the conditions leading to removal still persisted; and (3) abandonment by failing to support the Children. DCS alleged that termination was in the Children's best interest.

Mother testified that she was separated from Father during the period July 2008 to December 2008, because she "wanted to be more independent." Mother got her GED and her CNA[4] license. Mother and Father reunited, and Mother reported that she attended numerous counseling sessions with GRAAB. At the time of the first hearing, Mother reported that their relationship had improved, and that the counseling had helped. Mother admitted that from September 2007 until September 2009, the parties had at least five residences, and she had three jobs. The parties also had another child, a boy named J.J., shortly before the first hearing.

---

[2] Ms. H., the boyfriend's mother, also reported that this was not the first time mother had left the Children in the car while at her house, and that Mother was generally not very attentive or concerned toward the Children.

[3] GRAAB is an acronym for Going Respectfully Against Addictive Behaviors.

[4] Certified Nursing Assistant.

Father reported that he had several jobs between September 2007 and September 2009, mostly in the field of auto mechanics. Father reported that he completed a semester at Chattanooga State with straight A's, but this assertion was later proven to be false. One in-home service provider who worked with the parents, Manda Kingsley, testified that Father had also lied to her about losing his job, and that the truthfulness of the parents was "always an issue." She testified that she constantly had to "check up" on the things they reported to determine if they were telling the truth. Ms. Kingsley testified that once the parents figured out that they could sign up for classes and obtain grants/student loans, they seemed satisfied to rely on this financial assistance rather than working. Kingsley reported that the parents often did not have money for gas or food, and that she had observed them fighting over money, Mother's boyfriend, a car, etc. Kingsley testified that Mother often told her she was leaving Father, and that, in the six months she had worked with the parents, she saw no improvement in their stability. Kingsley further testified that she felt the parents had underlying mental health issues that needed to be dealt with.

Mother was assessed by a senior psychological examiner, Martha Biller. Biller opined that Mother did not have the ability to appreciate why her Children were in custody, and that she demonstrated a lack of concern regarding the issue. Biller testified that she could not recommend that the Children be returned to Mother without further extensive counseling because Mother simply had not adjusted to the role of an adult, and had no great sense of right and wrong. Biller opined that while Mother was very young, she likely would not improve as she got older. Father was assessed by a psychologist, Dr. Tom Biller, who testified that Father was very intelligent, but was prone to minimize or disregard problems with himself. He said Father lacked self-insight.

A number of prior landlords/employers testified at the first hearing. Their testimony established that the parents had a pattern of being evicted or having to leave rental properties for failure to pay rent, and that Father was fired from one job for carelessness with equipment. Mother had been fired from her job as a cashier at Checkers for keeping money that belonged to a customer, and she also had tardiness issues. When asked at the first hearing whether she thought the parents had made significant progress on their permanency plan, Hickman, the case manager, testified she could not say because the parents failed or refused to bring her requested documentation regarding classes, jobs, housing, counseling, etc. Hickman testified she felt the parents had "given up" on trying to communicate or cooperate with her. She said the parents would try to do well for a little while, and then stop and "drop back to zero". Hickman testified that the State had spent over $35,000 on this case by the time of the first hearing.

An order was entered by the trial court on June 8, 2010, reciting that, after the trial was completed, the court took the matter under advisement. The order went on to recite that

DCS had then asked the court to reopen the proof due to DCS's subsequent discovery of material evidence. DCS presented proof from Chattanooga State showing that Father had not completed his courses as he had testified at the hearing. The court also found that Father had only visited the Children twice in the eight months prior to the first hearing. Father claimed that this was due to his work schedule, but DCS presented records showing that he only worked eight to five Monday through Thursday. At the guardian's suggestion, the court agreed to hold the petition in abeyance for 180 days, as the parents had made some progress. The court admonished the parents to cooperate with DCS and work on the requirements of their plans. The court ordered DCS to develop new plans requiring a stable home, regular visits, demonstration of appropriate parenting by both parents, stable jobs, and treatment of Father for alcohol/anger issues.

Exactly one month later, visitation was suspended by an ex parte order because of an alleged danger to the Children. A hearing was held on April 13, 2011, and the court admonished the parents not to have Mother's eleven-year-old stepbrother living in the house with the Children. It also admonished the parents to stop depending on student loans to pay their expenses, and to continue in counseling. Regarding Wife's stepbrother, the court stated, "if he shows up again and spends the night, we are done."

A final hearing was held over multiple days in September 2011. Ken Auberry testified that Father had worked for him for about 18 months, but was recently let go because he couldn't perform the tasks assigned to him. Auberry further testified that Father could not comprehend how to do more complicated procedures. Representatives from Cleveland State testified that Mother enrolled in the summer and fall 2010 semesters, as well as for spring 2011. Mother failed 30 of the 36 hours for which she enrolled. Mother received over $8,000 in Pell Grants, plus several thousand dollars more in student loans. Father admitted that he got a student loan of almost $4,000 for the one semester of classes he attended.

Father also testified that, when the parties got a tax refund of $5,000, they used it to buy a boat, boat parts, a van, van parts, some clothes, and to eat out a couple of times. Ms. Hickman testified that Mother showed her a diamond ring that they had bought with funds from the tax refund. Father had decided to leave the auto mechanic trade and had recently obtained a job as a roofer. Mother had been working at a job with a cleaning service on a part-time basis for about three months. The parties had maintained stable housing for over a year.

The parties testified that while Mother's stepbrother had lived with them for some time in 2009 and 2010, he had not stayed overnight with them since the court's order in April 2011. They admitted that he previously slept in a bed that was in the Children's room, and that the Children slept in bunk beds. The parties denied that he had spent the night in their

home since they were admonished not to have him present, and stated that they did not know why the Children would have said that he did. The parties also denied the Children's report that their sibling, J.J., had touched the Children in their private parts, although Father testified that when he was potty training, J.J. would point to the Children's private parts and say "pee-pee."

Father stated that the parties had to discontinue counseling because DCS would no longer pay for it and they couldn't afford it. Father testified that the parties did not have TennCare. Mother testified, however, that the parties did have TennCare for a while, but that it ended when she failed to return the enrollment packet. Mother testified that she had a miscarriage earlier in the year, and that she did not believe in birth control because she was Catholic.

The Children's counselor, Nikki Kraus, testified that the Children had reported sleeping in the same bed with their "Uncle" just a couple of months before trial. They told her that he was once again living with Mother and Father. Another DCS employee, Hope Tharp, testified that CPS[5] had received a referral in June 2011 based on the parents' lack of supervision for four children in their home, one of whom was the stepbrother. Tharp testified that the Children had reported to someone that J.J. was touching them, and that the claims were still being investigated. The Children's foster mother testified that the Children didn't mention the stepbrother for a while after the court's order in April, but that, in June, Holly spontaneously reported that he was staying with Mother and Father again and that he was sleeping on the couch or on the floor in their room. Holly also reported spending the night with the maternal grandmother (who was not an approved childcare provider because of her prior issues with DCS), and Holly stated that she slept in the same bed with the grandmother and the stepbrother. Both Children also reported that J.J. would "reach in their pants and touch their pee-hole."

Two of the maternal grandmother's neighbors testified that they saw Mother's stepbrother at the maternal grandmother's house on a regular basis, but admitted that he wasn't always there and that they didn't know where he slept at night. One of those neighbors was unaware that the stepbrother had ever lived anywhere else, while the other testified that he had been back with the maternal grandmother since April. One of the parents' neighbors testified that she lived very close and frequently talked/visited with the parents, and had not seen the stepbrother there in a long time. Father's part-time employer, Mike Holden, testified that he often spent time with the family and that the stepbrother had not been with them since winter as far as he knew. Holden also testified that the parents were very attentive and caring toward the Children.

---

[5]Child Protective Services.

The current foster mother testified that the Children had been with her and her husband for almost three years, and that they loved the Children very much and wanted to adopt them. She testified that she had a good relationship with the parents at first, but that, due to the parents' actions, it deteriorated over time. She further testified that the Children were happy to go on visits with their parents, but would return home tired, unkempt, and with dark circles under their eyes. She testified that the Children would put themselves to bed because they were so exhausted. She stated that she set up counseling for the Children and was initially taking them every week, but Mother wanted to start taking them. She said Mother didn't take them as often. She testified that when the visits with the parents stopped in July, the Children never thereafter expressed a desire to see Mother or Father.

Another neighbor of the parents testified that his children sometimes played with Holly and Kylie, and that, on one occasion, Mother asked the neighbor if he and his wife would keep Holly, Kylie, and J.J. overnight so she and Father could go fishing all night. He testified that they agreed to keep the Children, and that a few weeks later Mother came over and told them that they – the neighbors – were going to be subpoenaed in this case. She asked them to say that the kids stayed there for a birthday party. The neighbor testified that he and his wife were upset that Mother asked them to lie in court, and they refused to do so.

Ms. Hickman of DCS also testified regarding this event, saying that, when she learned that the Children had spent the night with a neighbor, Mother told her it was for a birthday party. Hickman stated that while the parents had maintained their latest home for almost two years, it had become very cluttered. Mother had even asked if DCS could provide a maid to come in and clean it. Hickman testified that, at some point, DCS could no longer get funding to pay for the parents' counseling sessions, but that the parents had TennCare, which would have paid for this service.

Hickman testified that DCS conducted a foster care review board meeting after the April 2011 hearing. Mother stated that her stepbrother had been living in their home and it was none of DCS's business. Hickman further testified that the parents were still making bad decisions after all this time and after all of the help, and gave examples of them letting the stepbrother spend the night despite being ordered not to do so; letting the Children get severely sunburned; and letting the Children sleep in urine-soaked bedding as a form of potty-training. Hickman further testified that the parents should be doing better but were not. She said that their budget was still unrealistic, provided no surplus, and allotted nothing for the added expense associated with having the Children.

The trial court entered a final order on January 20, 2012, and made extensive findings. Among the findings, the court stated that Mother's counselor, whom the court found to be very credible, testified that Mother failed to grasp the magnitude of her problems and the

court proceedings, and that she put her own needs ahead of the Children's. The court noted that the parents were untruthful about many things, including their education/training. It found that mother lied on her financial aid applications to obtain grants/loans and then used the financial aid to pay living expenses rather than working. The court found that the parents left the Children with a neighbor overnight on one of the few weekends they had with the Children, then asked the neighbor to lie in court about what happened. The court found that the parents did not have sufficient income to provide for the Children, but used their 2010 tax refund to buy a boat and a van. The court found that the couple decided to have another baby despite their dire financial situation, and also that they failed to take the Children to their counseling sessions.

The court found that Mother's stepbrother was allowed to spend the night with the Children after the court ordered the parents to keep him away. The court found that the parents had little unsupervised time with the Children due to their own actions, and that their objective seemed to be to "defeat" DCS rather than working with DCS. The court found that, after visits, the Children were often exhausted and lacked proper hygiene, and that visits caused a regression in potty training. The court found that the Children had been in their foster home for some time, were happy and well-adjusted there, and had love and affection for the foster parents.

The court found that DCS had made exhaustive efforts to help the parents, and had spent over $18,000 the previous year. The court noted that, despite this help and repeated warnings, the parents had still failed to substantially comply with their plans. The court found that the parents still showed deficits in their parenting skills, and that Father still had job instability and it was questionable whether he could provide for the family. The court found that their proposed budgets were unrealistic, and that they still showed instability in that they had discontinued counseling, exposed the Children to possible sexual abuse, did not supervise them properly, and were uninterested in getting advice about their parenting skills. The court found that the parents had been given ample chances to regain custody of the Children, and that they had simply run out of time. The court found clear and convincing evidence of noncompliance with the permanency plan, clear and convincing evidence that the conditions leading to removal still persisted, and clear and convincing evidence that termination was in the Children's best interest.

The court found that there had been no lasting change after reasonable efforts by DCS to help, and that lasting change did not appear possible. The court found that changing caregivers would be detrimental to the Children, and that they had a strong bond with the foster parents, who wished to adopt them. The court found that DCS had "gone above and beyond" by helping with visitation, in-home services, counseling, parenting/psychological assessments, etc., and that the Children had been in foster care for four years. The court

found that the parents had done some positive things but not enough, that they had no way to support the Children, and that they had been less than honest with the court and DCS. The court thus terminated parents' rights. The parents filed a notice of appeal.

## II.

The parents present the following issues for our review:

> 1. Did the trial court err in finding that DCS had proven by clear and convincing evidence that grounds existed for terminating the parental rights of the [Mother and Father] pursuant to Tenn. Code Ann. §§36-1-113(g)(2) and 37-2-403(a)(2)(c)?
>
> 2. Did the trial court err in finding that DCS had proven by clear and convincing evidence that grounds existed for terminating the parental rights of the [Mother and Father] pursuant to Tenn. Code Ann. §36-1-113(g)(3)?
>
> 3. Did the trial court err in finding that termination of the parental rights of the parents was in the best interest of the Children?

## III.

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is against those findings. *Id.*; Tenn. R. App. P. 13(d). Great weight is accorded the trial court's determinations of witness credibility, which shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed de novo with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741 (Tenn. 2002).

As this Court has often stated:

> It is well established that parents have a fundamental right to the care, custody, and control of their children. While parental

-9-

rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interests of the child." Both of these elements must be established by clear and convincing evidence. Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.

*In re Angelica S.*, No. E2011-00517-COA-R3-PT, 2011 WL 4553233 (Tenn. Ct. App. E.S., filed Oct. 4, 2011)(citations omitted).

IV.

A.

Mother and Father challenge the trial court's determination that there was substantial noncompliance with their permanency plan, and that the conditions leading to removal still persisted at the time of trial. They also challenge the trial court's finding that termination was in the Children's best interest. It appears that persistence of conditions is the strongest and most apparent ground, thus it will be addressed first.

B.

The pertinent statutory scheme provides that grounds for termination exist when a child has been removed from the home of the parents for six months, and,

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

-10-

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home; . . .

Tenn. Code Ann. §36-1-113(g)(3). All of these requirements were met in this case.

The Children were very young when they were removed from the parents because the parents had left them with a nursery worker for over two weeks, the Children were sick, and were in need of medical care. The parents were completely unstable at that time, with no jobs, no home, and no parenting skills. Their initial permanency plan merely required them to obtain adequate and stable housing, to obtain stable jobs, to develop a budget, to attend relationship counseling due to instability in their relationship, and to develop their parenting skills by working with service providers. The case manager testified that she felt the parents were simply young and needed time to get on their feet, and that reunification could occur in a short period of time.

Once the Children were allowed to go home with the parents on a trial visit, however, the parents failed to adequately care for the Children by engaging in conduct that put the Children in danger, *i.e.,* fighting and domestic violence. It is also noteworthy that Mother left the Children in a car unattended for hours on a cold, winter night. The in-home service provider reported that she witnessed the parents fighting. She was aware that they often had no money for food or gas. The parents did not obtain stable jobs or housing, and at the time of the first hearing they had lived in five different places and had secured and lost numerous jobs.

By the time of the final hearing, when the Children had been in custody for four years, the parents still did not have stable jobs, as Father had recently left his original field of choice – auto mechanic – and obtained a job as a roofer. Mother had a part-time job with a cleaning service. She had only had it for about three months. The job provided little income. While they had maintained a residence for some time, the case manager testified that it had become cluttered and unkempt. The parents were no longer attending relationship counseling even though mother admitted that they had a funding source in TennCare until she failed to send in the necessary paperwork to keep TennCare. The parents also never submitted a realistic and workable budget, and the budgets they did prepare had very little money left over, and did not take into account the additional expense they would have if the Children were allowed to return to them.

-11-

Mother and Father both demonstrated a capacity for untruthfulness all the way through to the final hearing, lying about jobs, classes taken, and the identity of those who kept their children and why. During their limited weekend visits with the Children, they left them with unapproved caregivers such as the maternal grandmother and a neighbor, then asked the neighbor to lie in court about that incident. Mother and Father both developed an uncooperative and even antagonistic relationship with their case manager, their in-home service provider, and both the first and second foster mothers. The parents also showed bad judgment in their financial decisions. They enrolled in classes to get financial aid, but later dropped the classes and used the funds to pay their living expenses. They used funds from a tax refund for such frivolous things as an inoperable boat and a diamond ring.

Most importantly, the parents simply did not demonstrate that their parenting skills or decision-making ability had improved over the course of the years the Children had been in state custody, despite all of DCS's efforts to help them. The parents were ordered by the trial court in April 2011 not to allow Mother's stepbrother to spend the night with the Children, but the parents defied the court and then lied about it under oath. Mother made the bold statement at a foster care review board meeting that her stepbrother was still staying with them and that it was none of DCS's business. There were allegations and an ongoing investigation of possible sexual abuse. The proof showed that the parents failed to take the Children to their regularly-scheduled counseling appointments, let them suffer through painful sunburn and severe diaper rash requiring medical treatment, failed to give the Children proper hygiene and had them sleep in urine-soaked beds, and that they simply failed to adequately supervise and care for the Children while they were in their care. Thus, it is clear that conditions that led to removal or other conditions that would cause the Children to be subjected to further abuse/neglect still persisted, and that these conditions prevented the Children's safe return to the care of the parents. It is equally clear that, after four years and despite "exhaustive" and costly efforts by DCS, there is little likelihood that these conditions would be remedied at an early date so that the Children could be safely returned to the parents in the near future.

The counselors who assessed and worked with the parents testified that both parents exhibited a lack of ability to understand or take responsibility for their bad choices, and would instead choose to minimize problems with themselves. The court found the counselors to be credible. The parents were found to be lacking in self-insight, having no great sense of right and wrong. The court also found that they lacked concern regarding the circumstances that they and the Children were in. This is another factor which weighs in favor of a finding that the conditions which made it unsafe for the Children to be with their parents were not likely to be soon remedied. This Court has previously found that where parents deny responsibility for their children being in custody and fail to exhibit concern over same, this demonstrates that the conditions which persist are unlikely to be remedied.

***Farmer v. DCS***, No. 01A01-9610-JV-00485, 1997 WL 803709 (Tenn. Ct. App. M.S., filed Dec. 30, 1997).

Similarly, there can be no question that continuation of the parent/child relationship would diminish the Children's chance for early integration into a safe, stable, and permanent home. The foster mother testified that she and her husband were very bonded with the Children, having had them in their home for almost three years. She testified that the Children had made a lot of progress developmentally while in their care, and that they were happy and well-adjusted there. She further testified that she and her husband loved the Children and wished to adopt them, and that the Children had not even asked about the parents once visitation was suspended. The Children have been in foster care for most of their short lives, and they deserve to have the stability and permanency of an adoptive home. As a consequence of all these facts, we hold that the evidence does not preponderate against the trial court's finding that the ground of persistent conditions pursuant to Tenn. Code Ann. §36-1-113(g)(3) was proven by clear and convincing evidence.

C.

The parents also challenge the trial court's determination that there had been substantial noncompliance with the permanency plan. Several plans were entered into throughout the time the Children had been in custody, and the most recent plan was not significantly different from the first. Throughout the four years that the Children were in foster care, the plans required the parents to (1) have stable jobs, (2) secure stable housing, (3) work on improving their parenting skills, (4) develop a workable budget, and (5) attend relationship counseling. Later, requirements were added to address Father's issues with alcohol and anger. He was told to obtain an alcohol and drug assessment and attend anger management/domestic violence counseling.

When seeking termination for substantial noncompliance, DCS must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused removal. ***In re Valentine***, 79 S.W.3d 539 (Tenn. 2002). Such was clearly demonstrated in this case, as the trial court found, and that ruling has not been questioned. DCS must also show that a parent's noncompliance is substantial "in light of the degree of noncompliance and the importance of the particular requirement that has not been met." ***In re MJB***, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004), *citing **In re Valentine***, 79 S.W.3d at 548–49. Trivial deviations from the permanency plan's requirements do not amount to substantial noncompliance. ***Id.***

It is true that the parents did attend relationship counseling for some period, and they had maintained stable housing for almost two years at the time of the final hearing. Father

had maintained a job for 18 months, but had recently left that job to go into roofing, an entirely different field of endeavor for him. Father did have an A&D assessment and did attend some type of anger/domestic violence counseling. The parents also attended some other non-required parenting course. Thus, the parents had complied with certain requirements of the permanency plan.

The most important requirements of the plans, however, which dealt with the parents' demonstrated needs for (1) better financial planning and implementation of said plans, and (2) improvement in their parenting skills, had not been accomplished. Because of the instability in their income, the parents testified that they prepared a budget using an "average" of Father's monthly pay, and then subtracted their expenses. The parents were not able to demonstrate that their budgeted expenses were realistic. They were, up to a mere six months before the trial, utilizing financial aid that mother received for school to pay living expenses. Further, the parents could not show that if the Children were in their care, there would be any money available to care for them, as their budgets did not reflect any expenses related to the Children. These parents never demonstrated the financial stability necessary to make return of the Children feasible or reasonable.

Similarly, the parents were unable to show a marked improvement in their parenting skills, as they were still making bad choices regarding care of the Children even when their visitation was very limited. As stated earlier in this opinion, the Children were subjected to severe sunburn that resulted in blisters, had severe diaper rash that required medical treatment, had slept in urine-soaked bedding, had been exposed to possible sexual abuse, and had been left overnight with unapproved caregivers. The Children were also living in a home with an 11-year-old boy whom the court had ordered not to be there. The parents consistently maintained a cavalier attitude about their parenting, and instead of taking advice, they thwarted court orders, stated it was no one's business, and even asked witnesses to lie about their behavior. Thus, it is clear that the parents had not improved their parenting skills such that it would be safe for the Children to be returned to their care.

The parents' noncompliance is substantial "in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *See In re MJB, supra*. The main goal of their permanency plan was for the parents to demonstrate that they could be trusted to adequately care for the Children, financially, physically, and otherwise. The requirements with which they failed to comply were crucial in determining that they would be able to safely and effectively parent the Children. In another termination case wherein this Court was presented with the question of whether a parent who had completed some, but not all, of the requirements of her plan was in substantial noncompliance, this Court stated:

> It makes no difference how many parenting classes are completed if the parent is incapable or unwilling to learn anything from the classes and adjust his or her behavior accordingly. While we believe Mother did complete many of the physical requirements of the plan by attending parenting classes and the like, she did not accomplish any of the goals of the plan.

*State v. C.D.W.*, No. E2004-00623-COA-R3-PT, 2005 WL 94468 (Tenn. Ct. App. E.S., filed Jan. 11, 2005). Similarly here, the parents did not complete the goals of the permanency plan, *i.e.,* to become financially stable and provide a stable and secure home where the Children would be safe, where they would be adequately supervised and cared for, and where their needs would be met. The parents failed, after four years and near-herculean efforts by DCS, to comply with the reasonable goals set for them in the permanency plan, and, therefore, the trial court did not err in finding substantial noncompliance.

V.

Finally, the parents argue that the trial court erred in finding clear and convincing evidence that termination was in the Children's best interests. Tenn. Code Ann. §36-1-113(i) provides that, when determining whether termination is in the Children's best interest, the court should consider the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

In this case, as discussed at length above, the parents obviously had not made such an adjustment of their circumstances or conduct as to make it safe and in the Children's best interest to be in the parents' home. This failure to make a lasting adjustment was in spite of four years' time and more than reasonable efforts by DCS to assist; thus, lasting adjustment does not seem possible. The parents had maintained somewhat regular visitation with the Children, but their visitation was suspended when it was discovered that they were allowing the stepbrother to stay overnight. The Children had a relationship of sorts with the parents, but they also had a meaningful relationship with the foster parents, and a change of caretakers and physical environment would clearly be detrimental to their emotional and psychological, as well as physical, condition. The parents had previously shown neglect toward the Children, and there were allegations of inappropriate sexual behavior by the Children's brother. The physical environment of the parents' home was not shown to be safe due to the stepbrother staying overnight, and the Children being left with unapproved caretakers. The trial court found that failure to support was not proven, but it was shown that the parents' mental/emotional status would be detrimental to the Children as demonstrated

-16-

by their self-centered, cavalier, and unconcerned behavior.  The evidence does not preponderate against the court's finding, by clear and convincing evidence, that termination is in the best interest of the Children.

VI.

The judgment of the trial court is affirmed.  Costs on appeal are taxed to the appellants, Angela C. and Chad C.  This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE